**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DONALD C. BAYLESS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 3093** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Donald C. Bayless seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment. After careful review of the record, the Court now denies Plaintiff's motion and affirms the decision to deny him benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on September 19, 2006, alleging that he became disabled on June 30, 2004 due to a work-related "back injury with ruptured discs and lumbar fusion." (R. 122, 160). The SSA denied the application initially on February 8, 2007, and again upon reconsideration on August 1, 2007. (R. 14, 68-74, 77-80). Plaintiff filed a timely request for hearing and appeared before

Administrative Law Judge Mona Ahmed (the "ALJ") on November 14, 2008. (R. 14). The ALJ heard testimony from Plaintiff, who appeared with counsel, as well as from Medical Expert Walter J. Miller, Jr., M.D. (the "ME") and vocational expert Pamela Tucker (the "VE"). Shortly thereafter, on February 24, 2009, the ALJ found that Plaintiff is not disabled because he can perform a significant number of sedentary jobs available in the national economy. (R. 14-26). The Appeals Council denied Plaintiff's request for review on March 8, 2011, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ: (1) improperly rejected the opinions of his treating physician, George E. DePhillips, M.D.; (2) made a flawed credibility determination; and (3) failed to properly analyze his depression and low Global Assessment of Functioning scores. As discussed below, the Court finds no merit to these challenges, and affirms the ALJ's decision.

## **FACTUAL BACKGROUND**

Plaintiff was born on October 24, 1963, and was 45 years old at the time of the ALJ's decision. (R. 24, 31). He has one year of college education and a certificate in law enforcement. (R. 32-33). Plaintiff worked as a security officer at O'Hare International Airport until June 2004, when he injured himself on the job. (R. 161). He attempted to return to work in May 2006 but had to stop again in August 2006 due to back pain. (R. 149, 151).

A.     **Medical History**

   1.     **Back Impairment**

      a.     **Initial Injury and Treatment (June to November 3, 2004)**

While working at the airport on June 30, 2004, Plaintiff lifted a bag onto a machine and his back "popped." (R. 543). Prior to that time, he had been physically active, lifting weights, playing recreational sports, and serving as a Navy reservist. (R. 184). After the injury, he began experiencing low back pain with numbness and tingling extending down his legs. (R. 381). Plaintiff's physician, Sanjay Pethkar, M.D., ordered an MRI dated July 30, 2004, which showed central disc herniation and degenerative changes in the L5-S1 region. (R. 383). Dr. Pethkar referred Plaintiff for a neurosurgical consultation with Dr. George DePhillips, who examined Plaintiff on August 16, 2004 and suggested a course of conservative treatment, including physical therapy and epidural steroid injections. (R. 381).

Plaintiff initially responded well to physical therapy, then suffered worsening pain when Dr. DePhillips switched him to more strenuous work conditioning in September 2004. (R. 379). Plaintiff received an epidural steroid injection on October 4, 2004, and participated in 17 regular physical therapy sessions that month, demonstrating excellent effort and motivation. (R. 301-02, 379). On November 3, 2004, however, he told Dr. DePhillips that he could no longer live with the pain. (R. 378, 522). Dr. DePhillips ordered a discogram to better assess Plaintiff's condition. (R. 378).

### b. Spinal Fusion and Recovery (November 11, 2004 through April 2006)

Plaintiff's November 11, 2004 discogram showed "slight degenerative changes and a grade 1 spondylolisthesis"[1] at L5-S1, as well as a "subligamentous disc protrusion or annular tear." (R. 279-81). A CT scan taken after the procedure confirmed these findings. (R. 283). Dr. DePhillips reviewed the test results and recommended a lumbar decompression and spinal fusion, which he performed on January 25, 2005. (R. 305-08, 312-15, 378). After the procedure, Plaintiff's pain was well-controlled on Oxycontin, Toradol, and Vicodin. (R. 309-10). X-rays and CT scans taken on February 21, April 17, and June 13, 2005 were all normal, and Plaintiff reported doing "well" or "very well" throughout this period with physical therapy. (R. 298-300, 377-78). Indeed, Dr. DePhillips's June 15, 2005 treatment note makes no mention of pain whatsoever. (R. 377).

Approximately one month later, on July 13, 2005, Plaintiff complained to Dr. DePhillips that his pain had "not improved." (R. 376). Dr. DePhillips instructed him to stop physical therapy and obtain new X-rays and CT scans of the lumbar spine. (*Id.*). The July 15, 2005 tests both showed that the fusion remained solid with no disc protrusion or spinal stenosis, and that the alignment of the lumbar spine was normal. (R. 295, 297). At a follow-up visit with Dr. DePhillips on August 17, 2005, Plaintiff had "improved clinically," and the doctor recommended that he resume physical therapy. (R. 376).

---

[1] "Spondylolisthesis" is "a condition of the spine whereby one of the vertebra slips forward or backward compared to the next vertebra." http://www.medicinenet.com/spondylolisthesis/article.htm (last viewed on July 9, 2012).

The following month, on September 19, 2005, Dr. DePhillips remarked that Plaintiff was doing "extremely well," and was experiencing "more of a stiffness and discomfort" than pain. (*Id.*). The same day, Plaintiff's physical therapist documented that he had full lumbar range of motion with no pain, he was lifting objects up to forty pounds, and his core strength was progressing well. (R. 348). On October 17, 2005, Plaintiff had another X-ray that again showed the lumbar spine was "[s]table" following surgery with normal lumbar alignment. (R. 294). Dr. DePhillips reviewed the results with Plaintiff that day and agreed that "the fusion appears to be taking very well." (R. 375). He instructed Plaintiff to continue with physical therapy even though Plaintiff complained that the activity was causing his pain to "worsen[] somewhat." (*Id.*).

During Plaintiff's October 17, 2005 physical therapy session, he exhibited full range of motion with no pain, minimal soft tissue restrictions, and full core strength, and he was able to lift up to 65 pounds. (R. 356). Despite this progress, Plaintiff missed his next 10 therapy sessions and was discharged from the program on November 10, 2005 "pending MD recommendations." (R. 347). Dr. DePhillips then placed Plaintiff in a more strenuous work conditioning program beginning November 21, 2005. (R. 375).

On January 16, 2006, Plaintiff notified Dr. DePhillips that the work conditioning was aggravating his low back pain. (*Id.*). Dr. DePhillips ordered another lumbar CT scan at that time, noting that "[i]f the fusion is solid, I will declare maximum medical improvement and release [Plaintiff] to return to work with restrictions." (*Id.*). Plaintiff's January 31, 2006 CT scan confirmed that the

surgical fusion at L5-S1 was "near anatomic," just as it had been on July 15, 2005. In addition, Plaintiff exhibited the same "mild to moderate spinal stenosis . . . related to disc bulging and hypertrophy of the posterior elements" at L4-L5, and "[m]ild bilateral foraminal narrowing . . . at L3-4 and L4-5 related to degenerative changes." (R. 292). The following month, on February 6, 2006, Plaintiff told Dr. DePhillips that he could not complete the prescribed work conditioning because it aggravated his back pain. (R. 375). Though Plaintiff was doing "fairly well" at that time, he complained of "residual pain and tightness." (*Id.*). Dr. DePhillips "declared maximum medical improvement" and referred Plaintiff for a functional capacity assessment. (*Id.*).

Michael S. Gadomski of ATI Physical Therapy conducted a KEY Functional Assessment of Plaintiff on April 5, 2006. (R. 327). The test showed that Plaintiff was capable of working at a "VERY HEAVY Physical Demand Level," meaning he could: frequently lift 50-60 pounds; occasionally lift over 100 pounds; sit and stand for 8 hours a day; walk for 6 to 7 hours a day; and frequently bend, stoop, squat, crawl, climb stairs, crouch, kneel and balance. (R. 327, 329). Based on this assessment, Dr. DePhillips cleared Plaintiff to work as an airport security officer "without reservation" as of April 12, 2006. The doctor stated that Plaintiff had no significant low back pain and would be able to stand for 2 to 4 hours at a time, run in emergencies even over uneven terrain or over long distances, and frequently climb, bend, jump, and lift heavy objects, though "repetitive heavy lifting would not be recommended." (R. 373-74). Dr. DePhillips

also determined that Plaintiff's medication regimen would not prevent him from using firearms on a regular basis.  (R. 373).

> c.    **Unsuccessful Work Attempt and Relapse (May 2006 through January 2007)**

Plaintiff returned to work at O'Hare International Airport on May 19, 2006, where he spent six weeks sitting overnight at an exit on limited duty.  (R. 149).  After that time, he resumed full duty work, including bending and repetitive lifting of at least 70 pounds.  (R. 149, 151, 372).  In July 2006, Dr. DePhillips sent Plaintiff for another CT scan.  (R. 290-91, 325-26).  Compared to the scan taken on January 31, 2006, the July 11, 2006 scan showed "[m]oderate generalized disc protrusion" at L4-L5 that "appear[ed] slightly larger than on the prior study."  (R. 291, 326).  The new scan also showed "some ligamentous hypertrophy and some facet bony overgrowth" that "appear[ed] to contribute to a mild to moderate degree of central spinal stenosis which is slightly progressed" from the January 2006 scan.  (*Id.*).

During a follow-up visit with Dr. DePhillips on July 12, 2006, Plaintiff complained of low back pain with worsening numbness in both legs, noting the repetitive heavy lifting requirements of his newest job assignment.  (R. 372).  Dr. DePhillips indicated that this violated Plaintiff's work restrictions and placed him on the "same restrictions, as previously."  (*Id.*).  Dr. DePhillips also observed that Plaintiff "continue[d] to do well," and that the CT scan taken the previous day confirmed that his spinal fusion remained solid and intact.  (*Id.*).

Approximately one month later, on August 9, 2006, Dr. DePhillips wrote a note stating that Plaintiff was "totally disabled" and "not capable of meaningful employment." He did not explain this finding, but instructed Plaintiff to return in 4 to 6 weeks for another radiographic assessment. (*Id.*). Six days later, on August 15, 2006, Plaintiff quit his job as an airport security officer. (R. 149). When Plaintiff saw Dr. DePhillips again on September 13, 2006, he complained of "lower back pain with pain and numbness radiating into the right lower extremity." (R. 372). A CT scan of the lumbar spine taken that day was "normal with anatomical alignment," (R. 289), but Dr. DePhillips indicated that "[o]n examination [Plaintiff] has diminished mobility in the lumbar spine." (R. 372). Dr. DePhillips reiterated that Plaintiff was "totally disabled and unable to carry out meaningful employment," gave him a prescription for oxymorphone, and told him to return in 2 to 3 months for a follow-up evaluation. (*Id.*). Six days later, Plaintiff applied for disability benefits.

At his December 13, 2006 exam with Dr. DePhillips, Plaintiff continued to complain of lower back pain with pain and numbness radiating into his right leg. He also told Dr. DePhillips that he had fallen twice when his right leg gave out. (R. 406). Dr. DePhillips ordered additional CT and MRI scans and noted that Plaintiff was an excellent candidate for a spinal cord stimulator. (*Id.*). Plaintiff's December 20, 2006 MRI showed "some mild to moderate transfacetal narrowing due to ligamentous hypertrophy and facet bony overgrowth." (R. 434-35). There was no significant disc protrusion or spinal stenosis, but Plaintiff did exhibit "[m]ild encroachment . . . to the neural foramina bilaterally." (R. 435). A CT scan taken

the same day showed a "near anatomic" surgical fusion at L5-S1, "mild to moderate spinal stenosis" at L4-L5 "related to mild disc bulging . . . and mild hypertrophy," and "[m]inimal degenerative changes . . . elsewhere in the lumbar spine." (R. 436).

On January 15, 2007, Plaintiff told Dr. DePhillips that his pain was now radiating into both of his legs, his buttocks, and his posterior thighs. Dr. DePhillips again discussed the possibility of inserting a spinal cord stimulator to control the pain. (R. 438). Approximately two weeks later, on January 31, 2007, Paul Smalley, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 440-47). Dr. Smalley found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit, stand and/or walk for 6 hours in an 8-hour workday, and push and/or pull without limitation. (R. 441). Plaintiff could never climb ladders, ropes or scaffolds, but he could frequently balance and occasionally climb stairs and ramps, stoop, kneel, crouch and crawl. (R. 442).

### d.    Pain Management (May 2007 through August 2008)

More than three months later, on May 7, 2007, Dr. DePhillips recommended that Plaintiff undergo bilateral facet blocks at L4-L5 to help with pain. He also scheduled Plaintiff for another CT scan. (R. 506, 513). The results from that May 14, 2007 scan were once again largely unchanged, showing that the spinal fusion was still stable, and there was mild to moderate central canal stenosis at L4-L5. (R. 506).

Shortly thereafter, on May 25, 2007, Plaintiff started seeing Dr. Samir Sharma of the Pain and Spine Institute for pain management. (R. 596-98). Dr. Sharma administered lumbar facet injections on May 30, 2007, (R. 593-95), but Plaintiff told Dr. DePhillips on June 6, 2007, that they were not helping. (R. 513, 593-95). Based on Plaintiff's continued complaints of pain, Dr. DePhillips determined that Plaintiff had "permanent muscle and ligamentous damage as well as nerve damage," and reiterated that Plaintiff had reached maximum medical improvement such that no further recovery was expected. (R. 513).

Notwithstanding Dr. DePhillips's assessment of permanent muscle and nerve damage, Dr. Sharma observed that Plaintiff exhibited full range of motion, a normal gait, and normal strength in his legs on June 11 and 15, 2007. (R. 587-91). Plaintiff was taking several pain medications at that time, including Zanaflex, non-narcotic Lidoderm, Kadian (oral morphine) and Norco, and Dr. Sharma administered a second round of facet injections to try and control the pain. (R. 588, 592).

On July 3, 2007, Dr. DePhillips completed a Lumbar Spine Residual Functional Capacity Questionnaire for Plaintiff. (R. 557-61). Dr. DePhillips acknowledged that Plaintiff's lumbar fusion was "completely solid," but noted that he complained of low back pain "shooting into both hips and buttocks and radiating down . . . to the ankle[s]." (R. 557). Dr. DePhillips then opined that Plaintiff's degenerative lumbar disc condition rendered him "permanently and totally disabled" with "permanent muscle and ligamentous damage as well as nerve damage." (*Id.*). According to Dr. DePhillips, Plaintiff exhibited reduced

10

range of motion on flexion and extension; he could not bend, twist, stoop, or "carry out regular daily activities"; he could not walk a block without pain; he could only sit for 30 minutes and stand for 15 minutes at a time; and he needed a job that allowed him to sit and stand at will.  (R. 558-59).  A few days later, on July 11, 2007, C. A. Gotway, M.D., affirmed Dr. Smalley's contrary RFC assessment from January 2007.  (R. 502-03).

Plaintiff received additional facet injections from Dr. Sharma on July 19 and August 30, 2007.  (R. 576-77, 583).  He continued to demonstrate full range of motion, a normal gait, and full leg strength through November 21, 2007, but Dr. Sharma was still prescribing him a variety of pain medications, including Norco, Kadian, Methadone, Mobic, and Soma.  (R. 564, 567-68, 570-71, 573-74, 576, 579, 582).

On December 6, 2007, Dr. Sharma implanted a temporary spinal cord stimulator as a trial.  (R. 610-11).  The temporary stimulator relieved Plaintiff's pain by as much as 75%, providing "excellent relief," (R. 602), and Goran Tubic, M.D., implanted a permanent stimulator on April 14, 2008.  (R. 624-26).  At a follow-up visit with Dr. Tubic on June 6, 2008, Plaintiff said he felt "great" with "no pain," and Dr. Tubic described the surgical results as "excellent."  (R. 618).  The last available medical record shows that Plaintiff's pain remained under control as of August 1, 2008 such that he was no longer taking any pain medications.  (R. 617).

## 2.      Mental Health Issues (March through September 2007)

On March 16, 2007, a couple of months before he began seeing Dr. Sharma for pain management, Plaintiff went to Ananda Pillai, M.D., of Primary Care Physicians of Essington, with complaints of severe stress and depression. (R. 454).  Four days later, on March 20, 2007, he met with Thomas Lelio, M.D., a psychiatrist with the Central Professional Group, Ltd.  (R. 469, 475-78).  Dr. Lelio's notes are largely illegible, but it appears that he diagnosed Plaintiff with major depression secondary to his back injury.  (R. 476).  It also appears that Plaintiff complained of some suicidal ideations, though he denied any intention to act on those feelings.  (R. 478).

A few days later, on March 23, 2007, Plaintiff told Mary Vensel, a Licensed Clinical Social Worker with Dr. Lelio's practice, that he felt unstable all the time, was in constant pain and unable to sleep, and experienced feelings of worthlessness because he was unable to support his family.  (R. 554-55).  Ms. Vensel indicated that Plaintiff was suffering from major depression related to his chronic back pain, and recommended individual therapy.  (R. 555).  She assigned him a Global Assessment of Functioning ("GAF") score of 53 at that time, representing moderate symptoms.[2]  (Id.).  During visits with Dr. Lelio and Ms. Vensel on April 6, April 18 and June 13, 2007, Plaintiff showed some

_____

[2]      The GAF score is "a psychiatric measure of a patient's overall level of functioning." Jelinek v. Astrue, 662 F.3d 805, 807 (7th Cir. 2011).  A score between 51 and 60 reflects "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 807 n.1 (quoting American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-IV-TR) 34 (4th ed. 2000)).

improvement in his mood, but he continued to complain of feelings of frustration related to his back pain.  (R. 474, 548, 550).

On June 12, 2007, William N. Hilger, Jr., Ph.D., performed a mental assessment of Plaintiff for DDS.  (R. 481-84).  Dr. Hilger diagnosed Plaintiff with adjustment disorder with depression due to back injury and loss of employment, and assigned him a GAF score of 55-60.  (R. 484).  On examination, Plaintiff exhibited a "very negative, irritable attitude," (R. 483), and Dr. Hilger opined that depression was causing him to have "somewhat questionable mental potential . . . to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation."  (R. 484).  Dr. Hilger recommended that Plaintiff receive "appropriate psychiatric treatment and pain management," and suggested that he pursue a more sedentary work environment.  (*Id.*).  Dr. Hilger qualified his assessment, however, by noting that "the present test results are felt to provide a minimal estimate of [Plaintiff's] mental functioning in view of his questionable effort and negative attitude."  (R. 481).

Shortly thereafter, on June 30, 2007, Donald Henson, Ph.D., completed a Psychiatric Review Technique of Plaintiff for DDS.  (R. 488-500).  Dr. Henson opined that Plaintiff's adjustment disorder caused mild restriction in his activities of daily living, mild difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation.  (R. 491, 498).

**B.      Plaintiff's Testimony**

In an April 27, 2007 Activities of Daily Living Questionnaire completed in connection with his application for disability benefits, Plaintiff stated that before his injury, he led a "normal life," was always "outdoors doing something," and helped with household chores, cooking, grocery shopping, and childcare.  (R. 221, 228).  After the injury, he now spends most of his time in bed or on the sofa, and he worries about the effect his condition is having on his family.  (R. 222-23).  Plaintiff stated that he can sit for about 15 minutes at a time before his lower back starts hurting, and he needs to hold onto either furniture or other people in order to walk, stand and balance.  (R. 227).  He described himself as a "shut in" who is "depressed" and "a mere shell of myself."  (R. 228).

At the November 14, 2008 hearing before the ALJ, Plaintiff testified that he cannot work due to back pain accompanied by numbness down his right arm, right shoulder, and the back of both legs.  (R. 33-34, 51).  He spends most of the day lying around the house with his legs raised watching television and napping, and he is unable to do any chores.  (R. 38-39, 46, 49).  Plaintiff testified that if he gets up and moves around for more than 10 or 15 minutes, he needs to sit with his feet elevated "to take . . . stress off," or lie down again.  (R. 38).  He is unable to drive more than 30 minutes without having to get out of the car and stretch, and Dr. DePhillips, Dr. Sharma and Dr. Tubic all reportedly told him he probably should not drive at all.  (R. 45).

In response to questions from his attorney, Plaintiff complained that the spinal cord stimulator does not block the pain signals, and that he has fallen

14

twice since receiving the implant because his legs "[went] out."  (R. 41, 42).
Plaintiff recounted the variety of narcotic medications he has taken over the
years, such as Oxycontin, which he said made him jittery, lose his train of
thought, and fall asleep.  (R. 47).  At the time of the hearing, Plaintiff had started
taking Zanaflex and Norco again, though this is not documented in the record.
(R. 34).   According to Plaintiff, he still has some problems with short-term
memory loss since receiving the spinal cord implant in April 2008.  (R. 48).

With respect to his psychiatric treatment, Plaintiff explained that he
stopped going to therapy in 2007 in part because his doctor moved to a different
facility, and in part because "it wasn't changing any of the situations.  It was still
frustrating. . . . I know nothing is going to change. . . . so, why bother?"  (R. 40).

## C.    Medical Expert's Testimony

Dr. Miller testified at the hearing as an ME. He stated that based on his
review of the medical records, the spinal fusion surgery was successful and he
could not see a good cause for Plaintiff's pain.  (R. 56).  He acknowledged that
Plaintiff was taking very strong medications such as Norco as of June 2008,[3] but
opined that it seemed excessive given the absence of any documented nerve
compression or damage.  (R. 56-57).  As for Dr. DePhillips's description of
"permanent muscle and ligamentis [sic] damage," the ME explained that this
would involve "reflex loss, sensation changes, [and] atrophy," but there was no
evidence of these symptoms reflected in the medical records.  (R. 55).

_____

[3]      Dr. Miller gave the date as August 1, 2008, but that record actually reflects that
Plaintiff had stopped taking all medications.  (R. 57, 617).

According to the ME, Plaintiff's biggest problem is "the sedation" from his medications.  The ME first opined that he did not "see how [Plaintiff] could work on all these medications, to be honest with you," noting Plaintiff's continued use of Fentanyl patches.  (R. 60).  The ME then clarified that Plaintiff is capable of performing sedentary work on the medications, but could actually do light work if he were placed on a more appropriate regimen.  (R. 60-61).

**D.      Vocational Expert's Testimony**

Pamela Tucker testified at the hearing as a VE.  The ALJ asked her to consider a hypothetical person of Plaintiff's age who can: handle light exertion; occasionally stoop; very rarely kneel, crouch, and crawl; and climb stairs and ramps; but cannot climb ladders or scaffolds; must have the option to sit/stand every hour; and must avoid vibrations, vibrating tools, unprotected heights, hazards, and hazardous machinery.  (R. 63).  The VE testified that such a person would not be able to perform Plaintiff's past light level job as an airport security officer, but could work as an order clerk (approximately 1,600 jobs available), assembler (approximately 2,000 jobs available), or bench worker (approximately 800 jobs available).  (*Id.*).  If the same person were limited to sedentary work, he could still perform the same number of jobs because there is no distinction between light work with a sit/stand option and sedentary work.  (R. 64).

In response to questions from Plaintiff's counsel, the VE stated that there are no jobs available to a person who needs to be in a reclined position, who falls asleep on the job four or five times a day, or who misses four days a month of work.  (R. 65-66).  Nor are there jobs that would accommodate a person who is

groggy half the time or who is unable to keep up with his job responsibilities.  (R. 66-67).

**E.      Administrative Law Judge's Decision**

The ALJ found that Plaintiff's "history of lumbar spine disc herniation treated with disc fusion" is a severe impairment, but that it does not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16, 18).  Plaintiff's adjustment disorder is not a severe impairment because it causes only minimal limitations in his daily activities, social functioning, and ability to maintain concentration, persistence or pace.  (R. 16-17).

After discussing the medical and testimonial evidence in detail, the ALJ determined that Plaintiff has the capacity to perform unskilled, sedentary work with the following restrictions: he must change positions once an hour; he can occasionally stoop and climb stairs; he can very rarely kneel, crouch, and crawl; he cannot climb ladders, ropes or scaffolds; and he should avoid heights, hazardous machinery, vibrations, and vibrating tools.  (R. 18).  The ALJ accepted the VE's assessment that Plaintiff is not capable of doing any of his past work, but that there are a significant number of jobs in the national economy that he can still perform.  (R. 24-25).

In reaching this conclusion, the ALJ acknowledged Dr. DePhillips's opinion that Plaintiff is "permanently and totally disabled," but declined to give it significant weight.  (R. 23).  The ALJ noted that Dr. DePhillips failed to explain why his opinion changed from April 2006, when he released Plaintiff to very heavy full time work "without reservation," to August 2006, when he stated that

17

Plaintiff was incapable of employment. (R. 23-24). The clinical tests do not reflect any meaningful alteration in Plaintiff's condition to account for these "contradict[ory]" evaluations. (R. 23). In addition, there is no evidence of atrophy, weakness, or reflex or sensory abnormalities supporting Dr. DePhillips's diagnosis of muscle, ligament, and nerve damage. (R. 24).

With respect to Plaintiff's testimony, the ALJ determined that his statements regarding pain and limitations were inconsistent with the "generally unremarkable medical findings." (R. 22). Plaintiff did require aggressive surgical treatment, but Dr. Sharma and Dr. Tubic both reported that he responded "excellent[ly]" to the spinal cord stimulator. (R. 21). In addition, though Plaintiff has "at times taken substantial medications for pain," he required no further medication as of August 2008. (R. 22). The ALJ concluded that Plaintiff's assertion that the pain relief was only temporary "is not documented in the medical record, and suggests [he] might have been overstating the severity of the problems at the hearing." (R. 21).

Based on these findings, the ALJ determined that Plaintiff is not disabled within the meaning of the Social Security Act, and is therefore not entitled to benefits.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is

severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. 42 U.S.C. § 423(d); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawfor*d, 633 F. Supp. 2d at 630. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfe*l, 227 F.3d 863, 868 (7th Cir. 2000).

## C. Analysis

Plaintiff argues that the ALJ's decision should be reversed because she: (1) improperly dismissed the opinions of Plaintiff's treating physician, Dr. DePhillips; (2) made a flawed credibility determination; and (3) failed to consider Plaintiff's history of depression and low GAF scores. The Court addresses each argument in turn.

### 1. Treating Physician's Opinion

Plaintiff first objects that the ALJ erred in evaluating Dr. DePhillips's opinion, arguing that it should have received great or controlling weight because it came from a treating physician, specializing in Neurosurgery, who examined Plaintiff multiple times over a period of years. (Doc. 22, at 5, 8). It is well-established that the opinion of a treating physician is given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astru*e, 647 F.3d 734, 739 (7th

Cir. 2011); *Campbell v. Astru*e, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5) whether the opinion was from a specialist. 20 C.F.R. § 404.1527(c)(2)-(5). *See, e.g.*, *Simila*, 573 F.3d at 515.

The ALJ acknowledged that Dr. DePhillips is a specialist who treated Plaintiff over a long period of time. (R. 23). She nonetheless declined to give his opinion significant weight because it is internally inconsistent, unsupported by the objective medical evidence, and lacking in meaningful explanation. (*Id.*). There is ample support for this conclusion.

First, Dr. DePhillips gave radically different assessments of Plaintiff's condition in April and August 2006 without providing any explanation. Specifically, on April 12, 2006, Dr. DePhillips released Plaintiff to work "without reservation," stating that he could stand for 2 to 4 hours at a time, run in emergencies (including over uneven terrain and long distances), frequently climb, bend, jump, and lift heavy objects, and use a firearm. (R. 19, 23, 373-74). Then just four months later, on August 9, 2006, Dr. DePhillips opined that Plaintiff was "totally disabled" and "not capable of meaningful employment." (R. 372).

As the ALJ noted, the diagnostic tests do not support this drastic change in Dr. DePhillips's opinion. (R. 23-24). When Dr. DePhillips released Plaintiff to

heavy work in April 2006, his most recent CT scan from January 31, 2006 showed that he had "mild to moderate spinal stenosis" with some disc bulging and "[m]ild bilateral foraminal narrowing." (R. 292). Scans taken in February, April, June, July, and October 2005 produced nearly identical results. (R. 294-95, 297-300, 377-78). Plaintiff's next CT scan dated July 11, 2006 showed only a "slightly larger" disc protrusion and "slightly progressed" spinal stenosis compared to the January 2006 scan, but was otherwise unchanged. (R. 291). Dr. DePhillips offered no explanation for why the slight diagnostic changes observed in July 2006 rendered a man who could previously engage in very heavy work completely disabled and incapable of any employment in August 2006. (R. 24).

It is true that Dr. DePhillips expressed some concern that Plaintiff was repetitively lifting 70 or more pounds of weight shortly after he returned to work. (*Id.*). He also documented diminished mobility in Plaintiff's lumbar spine as of September 13, 2006. (R. 24, 372). Yet Plaintiff's CT and MRI scans produced stable results through May 14, 2007. A December 20, 2006 CT scan, for example, showed a "near anatomic" surgical fusion at L5-S1, "mild to moderate spinal stenosis" at L4-L5 "related to mild disc bulging . . . and mild hypertrophy," and "[m]inimal degenerative changes . . . elsewhere in the lumbar spine." (R. 436). On these facts, the ALJ fairly questioned whether Dr. DePhillips was "attempting to help his patient" by finding him "totally disabled." (R. 24). *See, e.g., Brown v. Astrue*, No. 10 C 2153, 2012 WL 280713, at *13 (N.D. Ill. Jan. 30, 2012) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)) ("The

patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

Plaintiff argues that the ALJ should have recontacted Dr. DePhillips to "ask him why his opinion might have changed." (Doc. 30, at 4). The regulations require an ALJ to recontact a treating physician if the evidence "is inadequate for [her] to determine whether [the claimant is] disabled." *Brown*, 2012 WL 280713, at *17 (quoting 20 C.F.R. §§ 404.1512(e), 416.912(e)). SSR 96-5p further provides that if "the adjudicator cannot ascertain the basis of the [treating source's] opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."

Here, the ALJ had access to all of the medical evidence that Dr. DePhillips used to form his opinion, including 9 CT scans, 5 X-rays and an MRI. Dr. DePhillips documented his findings each time he saw Plaintiff from the date of his back fusion in January 2005 until July 3, 2007, covering some 19 appointments. In addition, the record contains numerous treatment notes from Dr. Sharma and Dr. Tubic. There is no suggestion that Dr. DePhillips relied upon some additional test or scan, much less one that might explain why the "slight" changes in Plaintiff's CT scans caused him to go from being capable of very heavy work to

being totally disabled. The ALJ did not err in failing to recontact Dr. DePhillips on this issue.[4]

Plaintiff next insists that the ALJ failed to consider that his condition worsened over time, which would explain why Dr. DePhillips changed his opinion. (Doc. 22, at 7-8; Doc. 30, at 4). Plaintiff directs the Court to Dr. DePhillips's June 6, 2007 treatment note, which documents that he obtained "minimal relief" from bilateral facet block injections and continued to complain of "pain shooting into both hips and buttocks and radiating down" his legs. (R. 513). According to Dr. DePhillips, Plaintiff had permanent muscle, ligament and nerve damage at that time, with "no ability to bend and twist his lower back without significant pain." (*Id.*). He also had "flexion ability to 50 degrees" and "[e]xtension ability 10 degrees pain acutely," and he "need[ed] to support himself to obtain an upright posture." (*Id.*). Dr. DePhillips reiterated these findings in a July 3, 2007 Lumbar Spine RFC Questionnaire. (R. 557-61).

Leaving aside the fact that these records are dated nearly a year after Dr. DePhillips had already determined that Plaintiff was totally disabled, there is simply no objective medical evidence to support the alleged findings. The Seventh Circuit has stated that "a medical expert is obligated to point to objective medical evidence to explain [a] worsening prognosis." *Denton v. Astrue*, 596

---

[4] Plaintiff makes much of the ALJ's generic statement that "Dr. DePhillips did not provide much explanation for his opinion," (R. 23), insisting that this language shows the ALJ needed to recontact Dr. DePhillips for clarification. (R. 23; Doc. 22, at 5-6; Doc. 30, at 2). This argument ignores the ALJ's extensive discussion of the clinical findings and other record evidence that contradicts Dr. DePhillips's declaration of disability.

F.3d 419, 424 (7th Cir. 2010). Here, as noted, other than the "slight" changes documented in Plaintiff's July 2006 CT scan, there is no further deterioration reflected in any of the five subsequent scans (plus one MRI) taken through May 2007. Moreover, as the ALJ observed, "Dr. DePhillips's own examinations did not evince muscle loss or findings consistent with nerve damage, such as atrophy, weakness, reflex or sensory abnormalities." (R. 23). Indeed, the only "clinical findings, laboratory and test results" identified in the doctor's July 2007 RFC are "CT scan – shows that the interbody fusion at the L5-S1 level is completely solid." (R. 557).

Plaintiff claims that the ALJ improperly "played doctor" by "making her own independent medical determination that the [nerve] damage was not documented in the medical records." (Doc. 22, at 6). The Court disagrees. The ALJ clearly relied on the ME's uncontroverted testimony in that regard; namely, that muscle and nerve damage is accompanied by "reflex loss, sensation changes, [and] atrophy," and that Plaintiff did not exhibit such symptoms on clinical examination.[5] (R. 21, 23). *See, e.g., Walker v. Astrue*, No. 09 C 5001, 2011 WL

---

[5] Plaintiff objects to the ALJ's reliance on the ME's testimony, claiming that she failed to address or resolve his inconsistent statements regarding Plaintiff's ability to work. (Doc. 22, at 9; Doc. 30, at 6). On the one hand, the ME said that he did not "see how [Plaintiff] could work on all these medications – [F]entanyl patches," but he also opined that Plaintiff could perform sedentary work notwithstanding the medications. (R. 60-61). To the extent the last available medical record showed Plaintiff was not taking any more medications as of August 1, 2008, the ME's stated concern about Fentanyl patches seems misplaced. (R. 617). Indeed, Plaintiff himself testified that he used Fentanyl patches only "[u]p until . . . August" 2008. (R. 59). Regardless, the ME made it clear that "with all the medicines [Plaintiff was] taking[,] sedentary [work] would probably end up being where he would end up." (R. 60). On these facts, the ME's testimony is not inconsistent and the ALJ did not err in relying on his opinions.

1838721, at *6 (N.D. Ill. May 12, 2011) (ALJ properly relied on ME's testimony that the plaintiff's medical record did not show "disc herniation, nerve root compression, atrophy, or sensory or reflex loss."). The ALJ also explained that notwithstanding Dr. DePhillips's June 6, 2007 assessment of reduced flexibility and nerve damage, Dr. Sharma routinely observed that Plaintiff exhibited full range of motion, a normal gait, and full leg strength between June 11 and November 21, 2007. (R. 23).

In a final effort to bolster Dr. DePhillips's opinion, Plaintiff maintains that there is record evidence of his muscle, ligament and nerve damage in the form of a "diagnos[is of] lumbar radiculopathy." (Doc. 22, at 7). Plaintiff identifies only two documents that use this term: an October 20, 2004 report from Dr. DePhillips (R. 301-02); and an April 14, 2008 Operative Report from Dr. Tubic. (R. 624). The first report is from before Plaintiff underwent spinal fusion, and Dr. DePhillips never mentioned radiculopathy in any post-procedure records. The second report does state that Plaintiff has been diagnosed with lumbar radiculopathy, but there is no evidence that Dr. Tubic performed any tests or examinations demonstrating such a condition. Nor did he impose any related restrictions on Plaintiff's activities. Indeed, by August 2008, Plaintiff's pain was so well-controlled with a spinal cord stimulator that he no longer needed medication. On this record, the purported "diagnosis" from Dr. Tubic in April 2008 does not support Dr. DePhillips's June 2007 opinion that Plaintiff suffers from nerve damage that renders him incapable of employment. *See Allen v. Astrue*, No. 10 C 994, 2011 WL 3325841, at *12 (N.D. Ill. Aug. 1, 2011) ("A mere

26

diagnosis does not establish functional limitations, severe impairments, or an inability to work.").

Given the absence of any objective medical basis for Dr. DePhillips's opinion that Plaintiff is totally disabled and suffering from permanent nerve damage, the ALJ's decision not to afford that opinion significant weight is supported by substantial evidence and will not be reversed.

### 2. Credibility Determination

Plaintiff next argues that his case must be remanded because the ALJ erred in finding his testimony less than fully credible. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

The ALJ began her credibility discussion with the following language: "I find the claimant's medically determinable impairments could reasonably be

expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [stated] residual functional capacity assessment."  (R. 20).  Though the Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless boilerplate," ALJs continue to use it in their decisions.  *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).  Not surprisingly, Plaintiff seizes on this language as evidence that the credibility finding is backwards and defective.  *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to the credibility analysis in this case.  *Shauger*, 675 F.3d at 696.  Nevertheless, the ALJ went on to provide a detailed discussion of Plaintiff's symptoms and testimony, and the reasons she did not find his statements fully credible.  The ALJ first noted that Plaintiff's reports of pain were not supported by medical evidence.  X-rays and CT scans taken between August 2005 and December 2006, for example, all showed that Plaintiff's spinal fusion was solid with no disc protrusion and normal lumbar alignment.  (R. 20).  A December 20, 2006 MRI produced no evidence of significant disc protrusion or spinal stenosis, no distortion in the thecal sac, and unremarkable neural foramina at the L5-S1 level.  (R. 20-21, 434-35).

When Dr. Sharma examined Plaintiff in 2007, he exhibited "full active range of motion, his reflexes were intact, he was capable of walking with a normal gait, and [he] possessed normal strength in his lower extremities." (R. 21). After Plaintiff received a spinal cord stimulator, he felt "great" with "no pain" on June 6, 2008, and he was no longer taking any pain medication as of August 1, 2008. (R. 21, 617-18). The ALJ noted that based on these clinical findings, the ME testified that "the medical evidence does not really explain the level of reported pain." (R. 21). Specifically, (1) "the diagnostic studies show the fusion is fully healed"; (2) "no residual process was noted on clinical examination such as atrophy or weakness in [Plaintiff's] back or limbs"; and (3) Plaintiff "demonstrated the ability to lift and stand during the functional capacity assessment." (*Id.*).

Plaintiff insists that the ALJ ignored other clinical evidence suggesting that the spinal fusion did not produce a good result, namely, the fact that Dr. DePhillips diagnosed him with "failed back surgery syndrome," a general term referring to "chronic severe pain experienced after unsuccessful surgery for back pain." (Doc. 22, at 12; Doc. 30, at 8) (citing R. 624 and http://nyp.org/health/failed-back.html). As a preliminary matter, the record Plaintiff cites to is Dr. Tubic's April 14, 2008 Operative Report, which is the only place the term appears in the record. (R. 624). In any event, this "diagnosis," like the diagnosis of radiculopathy discussed earlier, is not supported with reference to any clinical findings. Moreover, subsequent notes from Dr. Tubic indicate that Plaintiff was pain free and off his medications as of August 1, 2008.

(R. 617, 618).  On this record, the purported diagnosis of failed back surgery syndrome does not support Plaintiff's claim of disabling pain.

In addition to reviewing the medical evidence, the ALJ also discussed the other factors listed in SSR 96-7p, including several that supported Plaintiff's testimony.  As the ALJ noted, Plaintiff "did require surgery, an aggressive form of treatment," (R. 21), his work history was "to [his] credit," and his generally consistent testimony about his activities of daily living "gives some support [to] his allegations." (R. 22).  The ALJ determined that other factors weighed against Plaintiff's credibility, however, particularly the August 2008 report that he no longer needed any pain medication.

Plaintiff stresses that despite the solid spinal fusion, he continued to pursue extensive treatment options, including physical therapy, medications, facet injections and blocks, and implantation of a spinal cord stimulator.  (Doc. 22, at 12; Doc. 30, at 7-8).  He claims that none of these treatments relieved his pain, and insists that the ALJ "should have considered whether [he] would have undergone all of these procedures if he really was not in severe pain." (*Id.*) (citing *Goble v. Astrue*, 385 Fed. Appx. 588, 591 (7th Cir. 2010)) ("We have deemed it improbable that a claimant would undergo pain-treatment procedures such as heavy doses of strong drugs in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking.").

It is true that beginning in July 2006, Plaintiff reported that his back pain had returned, and he received several facet injections and blocks from Dr.

Sharma in 2007.  He was also taking a variety of strong medications, including Norco, Kadian, Methadone, Mobic, and Soma.  The problem for Plaintiff is that Dr. Sharma and Dr. Tubic both stated that he subsequently responded very well to, and obtained "excellent" results from, the spinal cord stimulator.  (R. 21, 602, 618).  Plaintiff says the stimulator provided only temporary relief, but the ALJ fairly observed that the "alleged return of pain is not documented in the medical record, [which] suggests [Plaintiff] might have been overstating the severity of his problems at the hearing."  (R. 21).  As noted, the last available medical record from August 1, 2008 states that Plaintiff no longer required any pain medication at all.  (R. 22, 617).  *See Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) ("Applicants for disability benefits have an incentive to exaggerate their symptoms, and an [ALJ] is free to discount the applicant's testimony on the basis of other evidence in the case.").

The August 1, 2008 treatment note notwithstanding, the ALJ expressly acknowledged Plaintiff's use, at times, of "substantial medications for pain, including narcotics and a [F]entanyl patch."  (R. 22).  She also cited Plaintiff's testimony that the medications cause "drowsiness, difficulty concentrating, and memory problems."  (*Id.*).  Plaintiff objects that the ALJ still did not properly consider the effects of his medications on his ability to work, noting her comment that "the medical record does not reflect that [he] reported these side effects to his physicians."  (*Id.*).  As the Seventh Circuit has stated, "we are skeptical that a claimant's failure to identify side effects undermines her credibility – after all, . . .

some patients may not complain because the benefits of a particular drug outweigh its side effects." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

Here, Plaintiff's concerns based on the *Terry* decision are unfounded because the ALJ actually credited his testimony regarding "the possible sedating effects of medication on [his] ability to concentrate." (R. 22). Specifically, the ALJ determined that (1) Plaintiff's "use of strong pain relievers lends some support to [his] allegations, and is taken into account in finding he is limited to sedentary exertion," and (2) Plaintiff can only perform unskilled work, "which by definition requires little judgment to do simple tasks." (*Id.*). Plaintiff does not point to any evidence suggesting that he required greater restrictions due to concentration or sedation problems. Notably, in the July 2007 RFC Questionnaire, Dr. DePhillips left the section regarding "side effects of any medication" completely blank. (R. 558). On these facts, any error the ALJ may have made in mentioning Plaintiff's failure to report side effects to his doctors was harmless. *See McKinzey*, 641 F.3d at 892 ("[A]dministrative error may be harmless; we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

Plaintiff next contends that the limitation to unskilled, sedentary work fails to account for his need to lie down and nap throughout the day. (Doc. 22, at 13; Doc. 30, at 9). In making this argument, Plaintiff fails to identify a single physician who indicated that he would need to sleep during the day. Nor did any doctor suggest that Plaintiff would be unable to perform unskilled, sedentary work due to drowsiness, whether caused by medications or by the fact that the spinal

cord stimulator is "not very comfortable." (R. 46). As discussed, the ALJ fairly accounted for the sedating effects of Plaintiff's medications, and built a logical bridge between the evidence and her conclusion in that regard.

In sum, the ALJ considered all of the relevant factors set forth in SSR 96-7p and reasonably concluded that Plaintiff's complaints of disabling pain were not fully credible given the available evidence. The ALJ's credibility finding is not "patently wrong," *Castile*, 617 F.3d at 929, and does not provide a basis for remanding this case.

### 3. Depression and GAF Scores

Plaintiff finally argues that the ALJ committed reversible error by failing to properly address his depression and low GAF scores. (Doc. 22, at 14-15). At step two of the analysis, the ALJ discussed Plaintiff's mental status in detail, including Dr. Lelio's diagnosis of a depressed mood and irritability related to his physical problems. (R. 17). The ALJ also quoted Dr. Hilger's opinion that Plaintiff "appears to have somewhat questionable mental potential due to his depression and back condition to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation." (*Id.*) (quoting R. 484). The ALJ reasonably discounted Dr. Hilger's assessment, however, because he described Plaintiff as "uncooperative" during the exam, and reported that he felt "[o]verall, the present test results . . . provide a minimal estimate of [Plaintiff's] mental functioning in view of his questionable effort and negative attitude." (*Id.*).

With respect to Dr. Henson, the ALJ cited his observation that Plaintiff's mental impairment imposed no more than a "minimal degree of limitation on [his] daily activities, social functioning, or ability to maintain concentration, persistence, or pace." (*Id.*). In accordance with Dr. Henson's findings, the ALJ concluded that Plaintiff's "adjustment disorder and related depression were the result of stress caused by [his] alleged chronic back pain," and would not affect his work activity. (*Id.*). Based on this evidence, the ALJ subsequently found that Plaintiff's mental impairment did "not warrant any additional restrictions" in his RFC. (R. 24).

Plaintiff objects that the ALJ failed to mention his GAF scores, which both put him into the range of moderate symptoms or difficulties in social or occupational functioning. (Doc. 22, at 14-15; Doc. 30, at 10). "The GAF scale measures a 'clinician's judgment of the individual's overall level of functioning.'" *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003). It is intended to assist in making treatment decisions, and ALJs are not bound by GAF scores in assessing the extent of a claimant's disability. *Id.*; *Lopez v. Astrue*, No. 10 C 6515, 2012 WL 426899, at *9 (N.D. Ill. Feb. 10, 2012).

Given the ALJ's extensive discussion of the narrative findings provided by Dr. Lelio, Dr. Hilger and Dr. Henson, her failure to specifically mention Plaintiff's GAF scores does not serve as a basis for a remand in this case. *See, e.g., Denton*, 596 F.3d at 425 ("Rather than rely on the unexplained numerical score assigned by [the plaintiff's physician], the ALJ's ultimate finding of disability was substantially supported by [the physician's] narrative finding that [the plaintiff] had

no significant mental impairments."); *Warner v. Astrue*, __ F. Supp. 2d __, 2012 WL 3044244, at *9 n.5 (N.D. Ind. 2012).

Nor does the Court agree with Plaintiff's suggestion that the ALJ failed to adequately consider Dr. Lelio's diagnosis of "major depression secondary to . . . back injury." (Doc. 30, at 8-9). The ALJ expressly acknowledged that Plaintiff was suffering from a depressed mood and frustration as a result of his back pain. (R. 17). The ALJ also noted, however, that in June 2007, shortly before Plaintiff stopped receiving mental health treatment, Dr. Henson opined that he had only mild functional limitations stemming from his adjustment disorder. (R. 17, 40, 498). Plaintiff does not identify any mental health provider or consultant who imposed greater restrictions on his work activities. *See Compean v. Astrue*, No. 09 C 5835, 2011 WL 1158191, at *8 (N.D. Ill. Mar. 28, 2011) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)) (the ALJ "was entitled to rely upon the opinion of the state agency physician, particularly where no physician imposed any greater functional limitations than those found by the ALJ in her RFC determination."). Viewing the record as a whole, the ALJ's analysis of Plaintiff's depression and how it affects his RFC is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 21) is denied. The Clerk is ordered to enter judgment in favor of Defendant.

ENTER:

Dated:  August 6, 2012

SHEILA FINNEGAN
United States Magistrate Judge